**BALFOUR, GUTHRIE & CO., Limited, et al. v. AMERICAN–WEST AFRICAN LINE, Inc.**

**AMERICAN–WEST AFRICAN LINE, Inc., v. BALFOUR, GUTHRIE & CO., Limited, et al.**

Nos. 298, 299.

Circuit Court of Appeals, Second Circuit.

Aug. 2, 1943.

Martin Detels, of New York City (Bigham, Englar, Jones & Houston, Ezra G. Benedict Fox, and Daniel A. Sullivan, all of New York City, on the brief), for appellants.

Geo. Whitefield Betts, Jr., of New York City (Hunt, Hill & Betts and Helen F. Tuohy, all of New York City, on the brief), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

On a voyage from West Africa to New York in January, 1940, a hull plate of the steamship "Zarembo" cracked during heavy seas, sea water entered her No. 1 hold, and her cargo of cocoa beans was damaged. The cargo owners, Balfour, Guthrie & Co., Ltd., and Commonwealth African, Ltd., appeal from adverse judgments in a libel in rem for cargo damage and loss and in a cross-libel against themselves by the shipowner, American-West African Line, Inc., for general average. The substantial issue before us is whether the district court erred in finding that due diligence was exercised to make the ship seaworthy prior to the voyage. A narrower question is whether Commonwealth African was properly denied a right of recovery against the shipowner, for an alleged short delivery of 53 bags of cocoa beans, because of its failure to file the written claim of loss required by its bill of lading as a condition precedent to the shipowner's liability. The appeal in the cross-libel depends upon the appeal in the main libel. The district court referred the determination of general average to a commissioner.

■ There is no doubt that in fact the ship was unseaworthy at the time she sailed. Her plating where it cracked was worn thin in excess of 75 per cent, though, of course, this is hindsight; the maximum wear considered safe is 25 per cent. Only if due diligence was exercised to make the ship seaworthy can her owner be exculpated from liability. United States Carriage of Goods by Sea Act § 4, 46 U.S.C.A. § 1304.

■ The regular annual survey of the "Zarembo" was made in January, 1939, and her four-year special survey in November, 1939, just before the African voyage. During both, the plating was hammer tested, inside and out, by at least one surveyor. And numerous visual examinations of the hull were also made. All told, some fifteen men inspected the plate and riveting between the first survey and the time of the accident, in some cases on more than one occasion.

What would thus appear ordinarily sufficient as an exercise of due diligence disclosed no flaws, with the exception of some corrosion on the plate adjacent to the one which cracked; the survey report of January, 1939, recommended its renewal with-

in a year. But from this and from a warning of the American Bureau of Shipping, dated May 20, 1937, to all surveyors, that longitudinally framed ships like the "Zarembo" should be watched for grooving and corrosion, libellants contend that yet more stringent tests should have been applied. No practical tests, however, are proposed. And as the district court not unreasonably suggested, the warnings, in so far as they are given any effect, probably spurred the surveyors on to exercise even more care in the tests actually employed. In any event we need not go further into the niceties of examinations for seaworthiness, for enough has been said to show that the district court's findings of due diligence were by no means clearly erroneous. Cf. The Quarrington Court, 2 Cir., 122 F.2d 266; Petterson Lighterage & Towing Corp. v. New York Cent. R. Co., 2 Cir., 126 F.2d 992.

The district court also found that damage to the cargo was caused by perils of the sea. The evidence clearly supports a finding that the ship ran a gauntlet of perilous seas—for the wind was frequently 10 Beaufort scale, waves washed the ship's deck, and one in particular of a quite freakish nature shook the whole vessel violently, rivetheads popped off with the straining of the ship, and a long list of other heavy weather damages has been recounted, including a broken deck ladder, main rail cracked, galley smoke stack, range light stool, and vent pipes and cowls torn away, steering chains and turn buckles strained. Cf. Ore S. S. Corp. v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, July 26, 1943. The district court did not expressly find that perils of the sea alone proximately caused the damage. But this was unnecessary in view of its further finding of due diligence on the part of the shipowner to make the vessel seaworthy, which we have affirmed. At least perils of the sea were a contributing cause of the damage; thus witness the fact that the vessel withstood the voyage to West Africa and began to leak only after unusually severe weather was encountered on the return. Cf. The Warren Adams, 2 Cir., 74 F.2d 413, certiorari denied 163 U.S. 679, 16 S.Ct. 1199, 41 L.Ed. 316. This, of course, is further support for the conclusion that the shipowner should be exculpated from liability for sea water damage under the Act § 4(2), 46 U.S.C.A. § 1304(2).

■■ The district court erred, however, in holding that there could be no re-

covery by Commonwealth African for short delivery of cargo, because it failed to file timely written claim for the damage.[1] The covering bill of lading provided that the owner should not be liable for loss of cargo unless written notice thereof was given within thirty days after the goods should have been delivered and unless written claim therefor was given within six months "after giving such written notice." But the Act § 3(6), 46 U.S.C.A. § 1303(6), provides that failure to give "notice of loss or damage" shall not prejudice the right of the shipper to bring suit within one year after the date when the goods should have been delivered. To enforce a bill of lading provision conditioning a shipowner's liability upon the filing of written claim of loss, which, in turn, requires and depends upon the filing of a prior notice of loss, certainly would do violence to § 3(6). But further, as a like provision was apparently quite customary in bills of lading prior to the Act, the reasonable implication of § 3 (6) is that failure to file written claim of loss in no event may prejudice right of suit within a year of the scheduled date for cargo delivery. This is also to be concluded from § 3(8), 46 U.S.C.A. § 1303(8), that any clause in a bill of lading lessening the liability of the carrier otherwise than as provided in the Act shall be null and void. A similar provision in the British Carriage of Goods by Sea Act, 14 & 15 Geo. V, c. 22, has been interpreted to nullify any requirement of written claim as a condition to suit at any time. Cf. Australasian United Steam Navigation Co., Ltd. v. Hunt, [1921] 2 A.C. 351; Coventry Sheppard & Co. v. Larrinaga S. S. Co., 73 Ll.L. Rep. 256.

█ Nevertheless, as we view the circumstances, no modification of the judgments is called for. For it appears from the stipulation of the parties and from the testimony that the 53 bags in question were stored in hold No. 1, and were among the damaged cargo which was refused entry by the Department of Agriculture and finally sold as inedible oil. The salvage funds so realized seem to have been received by libellant Balfour, Guthrie & Co., for the latter apparently credited claimant with that amount in its statement of damages. Hence Commonwealth African at most was entitled to the trifling amount realized as salvage and owed its share of general av-

erage. The commissioner should make the proper credits in fixing general average.

Affirmed.

CHASE, Circuit Judge (concurring).

I concur in the result and in the opinion except that part which deals with the denial of recovery for the 53 bags which were lost. As to them I agree with the district judge that there can be no recovery because no written notice of claim was given within the time required by the terms of the bill of lading. That time limit was reasonable—within six months after the giving of written notice of loss. Apart from the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6) this was, therefore, a permissible limitation for the carrier to put into the contract of carriage that should be enforced. Bank of California v. International Mercantile M. Co., 2 Cir., 64 F.2d 97; The General G. W. Goethals, 2 Cir., 298 F. 935; The Susquehanna, 4 Cir., 296 F. 461.

Moreover, it does not seem to me that anything in the Carriage of Goods by Sea Act should be held to have foreclosed the right of a ship owner to make liability contingent upon the filing of a notice of claim just like the bill of lading did in respect to these lost bags.

That statute provides for the filing of a notice of loss within the time fixed upon pain otherwise of having the removal of the goods treated "prima facie" as evidence of the delivery by the carrier of the goods as described in the bill of lading. This is, indeed, the only real disadvantage the statute permits as a result of the failure to file a notice of loss for it allows suit to be brought within one year after the goods were, or should have been, delivered whether or not a notice of loss or damage was filed.

If a notice of loss or damage and a notice of claim were not different things, and presumably so considered by Congress when the statute was passed, I could agree that the statute made provision for suit even though no claim for loss as well as no notice of loss had been given. But they are two separate and distinct things. A. Russo & Co. v. United States et al., 5 Cir., 40 F.2d 39; Anchor Line v. Jackson, 2 Cir., 9 F.2d 543. Consequently merely permitting suit within the statutory time limit but only at

---

[1] Libellant did notify claimant promptly of the alleged shortage, but the parties do not appear to assert that this was a claim for the loss.

some disadvantage as to proof if no notice of loss has been duly given certainly does not, I think, put the failure to give any notice of claim into the same category and beyond the scope of a legitimate bill of lading agreement between carrier and shipper.

Nor does the broad, general provision in the Act that there shall "otherwise than as provided" be no lessening by agreement in a contract of carriage of the liability of the carrier for loss or damage to the goods caused by its negligence, fault or failure to comply with the statute make the district judge's conclusion untenable. The phrase "otherwise than as provided in this Act" means in its setting merely *contrary to the provisions of the Act* and cannot reasonably be thought to deprive the carrier of all right to make a contract of carriage "lessening such liability" simply because there is no language in the statute itself expressly and affirmatively permitting it.

I would affirm for the reasons above stated.